## John Nixon's Heirs *vs.* John B. Carco's Heirs.

It is a well settled rule, that equity will give effect to the real intentions of parties, as gathered from the objects of the instrument and the circumstances of the case, although the instrument may be drawn up in a very inartificial and untechnical manner, if the manifest intention and object of the parties be clearly described on the face of the instrument.

The cases are numerous where this principle has been applied to the execution of deeds and powers.

C. settled upon the land in controversy during the dominion of the Spanish government over it, and he held possession of it when the supposed conveyance was executed, and he thereby had an inchoate right of donation thereof from the United States, under the provisions of the act of congress of 3d of March, 1803, which was confirmed to C. in 1819. He (C.) had, at the date of the conveyance, not a mere naked possession; it was an inchoate right to the land, recognized by the government; and for the completion of which, the party entitled to it might well rely upon the good faith of the government: *Held*, that there is nothing in the act of congress which secured the right to prohibit the transfer of it, and there is nothing in the objects or policy of the acts of congress which would prevent it; and it is, therefore, a substantial equitable right which the party holding it might transfer; and when the title was confirmed in his'(C.'s) name, it enured equitably to the benefit of his vendee.

The instrument of sale, executed by C., purports to have been made for a valuable consideration, and to be a conveyance of his right; and it is manifest that the claim set up by his heirs is inconsistent with the right intended to be conveyed by him. If it were a formal bargain and sale, the heirs would be estopped by it; and it is conceded that it was intended as such. *Held*, that it must, therefore, be conceded as having that effect in equity, and falls within the general rule, that the heirs cannot set up a subsequently acquired title against the deed of bargain and sale of his ancestor.

N. cannot be regarded as the assignee of the legal title of C., because the instrument is insufficient to pass the legal right for want of the necessary legal formalities, and it was not made to N., but to others whose transfers are informal, and only sufficient upon principles of equity to pass the right. *Held*, that C. had an equitable interest, which he had a right to transfer.

The rule of equity is, that if one man knowingly, though he does it passively by looking on, suffers another to purchase, and expend his money on land, under an erroneous opinion of title, without making known his claim, he should not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is

bound by an equitable estoppel. *Dickson* v. *Green*, 24 Miss. R. 618, cited and confirmed.

This rule will be applied with more stringency when the acquiescence has been so long as to be fortified by the legal presumption arising from the great lapse of time; and in such a case almost every variety of written evidence of title will be presumed. The defective links in the chain of title will be supplied by presumption, and the title declared perfect, when the possession has continued for a great length of time without interruption. *Grand Gulf Railroad, &c.* v. *Bryan*, 8 S. & M. R. 279.

The failure to prosecute a suit, or take any steps to recover the land by those claiming under C. for so long a time, until the property had passed into the hands of N., must be considered a recognition of his equitable right.

On appeal from the southern district chancery court at Mississippi City; Hon. James M. Smiley, vice-chancellor.

This was a bill filed in the superior court of chancery, but afterwards removed to the vice-chancery court at Mississippi City. The object of the bill which was filed by the ancestor of plaintiffs in error, was to enjoin a judgment in ejectment obtained by the defendants in error, (the heirs of J. B. Corquette,) for a certain lot on the Bay of Beloxi. The plaintiffs in error set up an equitable title under an instrument signed by the said J. B. Corquette, and is as follows : —

(Translation.) " Pass Christian, October 7, 1815. I, the undersigned, declare that I, John Baptiste Carco, have sold to Messrs. Francis Bouquie and Anthony Martin, my plantation and two cabins situate thereon, together with the inclosure and all the rails, the plantation and all the clearing, from the mark B. to mark B., which were marked in the presence of Joseph Ludner, and extending in depth to the Bay. Said plantation is situated at the Bay Beloxi, for the sum of seventy dollars, which I declare to have received in cash before witnesses.

(Signed)          " Jerome Ryon, $\overset{\text{his}}{\times}$
                              mark,

                   Jerome Baptiste Carco, $\overset{\text{his}}{\times}$
                              mark.

" Witness, Baptiste."

The bill further alleges that Henry Krohn was the *bonâ fide* purchaser from Bouquie & Martin, of the portion of said lot

in controversy, and that complainant was a *bonâ fide* purchaser from Krohn, and had made valuable improvements, and has remained in continued and uninterrupted possession.   The bill also sets up a deed from the defendants to one William Rogers, for certain land on the Bay of Beloxi, describing it as " bounded on the west as the property of John Nixon," which is alleged to be an estoppel against the defendants.

The bill was demurred to, and the demurrer overruled, and at the August term, 1847, the defendants answered.

The defendants admit in their answer the possession and claim of their ancestor, in 1815, but allege that his right and his claim were only possessory, the land being a part of the public domain, but held by their ancestor from a date anterior to the cession of Louisiana by France.   It admits that their ancestor made a verbal sale, in 1815, to Bouquie & Martin of a part of his possessory claim, included in a certain fence of poles, and which is the same land.   They deny the authenticity of the deed above set forth, and charge it to be spurious; admit the payment of seventy dollars by Bouquie & Martin for the possessory right, but deny that this was a fair price for the fee-simple.   Deny that Krohn was a *bonâ fide* purchaser from Bouquie & Martin; on the contrary, he purchased no interest of Martin, but only of Bouquie.   That Krohn, both in law and fact, well knew he was obtaining no title whatever.   It admits improvements by Krohn, denies the uninterrupted possession by Bouquie and his assigns from the sale of 1815.   On the contrary, their possession was abandoned while it was yet public land, and the portion of the tract claimed by complainant outside the old clearing was never claimed or possessed by Bouquie, or Martin, nor ever occupied until Krohn took wrongful possession under his pretended purchase from Bouquie in 1831.   It admits the deed given to Rogers, but denies it to be an estoppel.   Admits possession by Bouquie & Martin, in 1815, of that part which was cleared, but of none else, and not of that part on which complainant's house now is.   But Bouquie & Martin afterwards abandoned the possession, and it was vacant until 1831, when Krohn took possession; and denies the sale to Krohn, but admits a sale by procuration from Bouquie to Krohn, the validity of which, how-

ever, they deny, or that Krohn's purchase was in good faith. It then attempts to explain the nature of the title of Corquette, and enters into an argument to show that various claims set up against the two hundred and eighty-five acres confirmed by the United States to said Corquette, are founded on fictitious and spurious writings.

An amended bill, subsequently filed, sets out more specifically the case of the complainant, alleging that Martin sold and transferred all his interest to Bouquie, who remained in possession; that Corquette, in his lifetime, and his heirs since, have lived in the neighborhood, recognized the title of the parties claiming under the Bouquie & Martin title, and have seen large and valuable improvements put upon the premises. The answer to the amended bill is substantially the same as the answer to the original bill.

At the August term, 1849, on bill of revivor the cause was revived in the names of the heirs of Nixon who had died.

At October term, 1850, one of the defendants, John B. Corquette having died, the cause was revived against his heirs whose names are set out.

The evidence was very voluminous in this case, and all that is material to the decision is set out in the opinion of the court.

The vice-chancellor dismissed the bill and the complainants appealed to this court.

*F. Anderson,* for appellants.

The document, exhibit A., the foundation of the claim of complainants, is sufficiently proved. 1 Phill. on Ev. 477; 3 Ib. 1310, &c.; 7 Wend. R. 371; 1 Blackford, R. 162; Ib. 165; 4 Wheaton, R. 213.

The instrument was sufficient in equity to convey the land and all the rights or expectations of Corquette founded on his settlement right. Land Laws, 122, 157; 2 U. S. St. at Large, 716; 3 Ib. 530; 26 Miss. R. 612.

The action of Corquette and his heirs in permitting the various conveyances and improvements established in proof without asserting their title, is a fraud upon the purchasers and improvers of the land. 24 Miss. R. 613; 1 Johns. Ch. 353; 5 Johns. Ch. 272.

That the statute of frauds is not applicable, see the brief of Judge Mayes.

The testimony of the witnesses on the documentary evidence is amply sufficient to establish the boundary of the plantation or settlement sold by Corquette to Bouquie & Martin, as beginning at the Jacques Ryon settlement, and extending west to four and three fourths arpents front, and back to the bay. The sale being not only of the inclosure but of the clearing and all the land between the posts B. B.

*John Henderson,* for appellees.

1st. Sale of a possessory right, without covenant warranty, raises no claim in law or equity against the vendor, to confirm such sale in fee, from vendor's title subsequently acquired. 1 Cowen, R. 616, 617.

2d. Heir of the ancestor not bound in law or equity to make assurance of title to land sold by such ancestor in fraud of a statute or against state policy. 1 Gr. Ev. § 24.

3d. The laws of congress expressly interdicted Carco from selling, settling, surveying, or marking boundaries on these lands, under penalty of forfeiture; and only to occupy himself by written permit. See 14 sec. of act 1804; L. L. 114, also § 1 & 2, act 1807; L. L. 156, 157.

4th. Deed of land sold where there was no title in *esse* does not pass the grantor's subsequent title by estoppel, if the first deed contain no covenants of warranty. *Mc Cracken* v. *Wright,* 14 J. R. 193.

Nor will such estoppel operate in favor of a deed, which recited the incumbrances under which the vendor acquired his subsequent title, though the first deed had covenants of warranty. 9 Cow. R. 272.

5th. The sale of Carco in 1815, was but of a squatter's possession, with not even the legal promise then of a right of preemption. Such possession has no intrinsic validity, and confers no equity. 8 S. & M. 268, 278 ; 3 How. U. S. R. 761 ; 4 Ib. 461, 462, 464. Sale by a preëmptioner is void. 10 S. & M. 596. Such sales of public land against law and public policy could constitute no foundation for a legal covenant or rule of estoppel.

1 Cushm. 48–52. And as the instrument, exhibit A., is not a deed, and contains no covenant of warranty, there is of course no estoppel. 1 Story, Eq. Jur. § 64 ; 1 Gr. Ev. § 24.

6th. We think it would be a full defence to this action, (though from sufficiency of previous defence unnecessary,) that the title paper of 1815, like Bouquie's conveyance to Krohn, purports to be an executed conveyance, and not a contract or agreement to convey. In this view of them, if insufficient for the objects intended, they are but mistakes in law, and not in fact ; are executed acts, satisfactory, and approved at the time by the parties. Now in such case, the vendor not being delin-quent, or in fault, cannot be put in wrong, either in law or equity. The parties must abide their legal opinions consummated in those acts. See printed brief herewith, on this point alone. One single familiar principle, does in fact embody all the law necessary for our defence in this case, which is, that a sale of lands made without fraud, and without covenant of warranty, entitles a purchaser to no relief in law or equity against vendor for the failure of title. That the purchaser bought in good faith, and paid full value, raises no equity. It would be useless to quote adjudicated cases on this point ; our reports are full of them. Now this alleged sale was made in 1815, under the same statute of conveyancing which exists now. Yet this executed conveyance contains no covenant of any sort, not even the words " grant, bargain, sell," and no fraud is charged.

That Krohn was not a purchaser for valuable consideration without notice, because case shows he had notice, and because no such rule, but in favor of one claiming legal title, or title by deed. Krohn had no deed. 10 Pet. R. 211, 212; 7 Ib. 271 ; 2 Stor. Eq. § 1502.

No claim for ameliorations or improvements allowed in equity but to a defendant, against whom plaintiff is seeking to recover lands, or rent and profits. And our statutes of 5th March, 1846, gives its redress only in courts of law. But Nixon has warranty of title from Krohn, who put up the improvements, and bill seeks no such redress, and makes no case for it. 2 Stor. Eq. § 799, 1237, 1238.

No prescription or limitation available. 1st. Because the legal

title was on the U. S. bill patent certificate, and patent in 1844, till which no limitations run, and since which, no time. 1 Cush. 52, 54; 4 How. Miss. 23, 24; 4 How. U. S. 184, 185; 13 Pet. R. 450, 516.   Also, no statute is plead; and if it were, it is too late after trial at law to set up the statute in equity.   14 S. & M. 158, 159.

Hence we pray, decree of the chancellor be affirmed.

*D. Mayes*, for appellants, in reply.

Carquette sold the land in controversy to Bouquie & Martin, and exhibit A. is a sufficient note or memorandum in writing, and is sufficiently proved.   Henry Ahrens proves that the sale was by bill of sale which he once had in his possession; he had it about the first of June, 1831, to have it recorded.   Willis Arnold, who was the clerk, proves that some time in 1830 or 1832, Ahrens called on him to record an instrument in writing, purporting, as he thinks, to be a document in favor of Bouquie; thinks it had proof appended to it by subscribing witness.   John Deleney proves that John B. Carquette told him that the land was sold, and he knew it, but the deed not being recorded they (purchasers) could not hold it.   (John B. Carquette is one of the defendants.)   Stewart Lewis saw it in 1831; it was annexed by the notary, in New Orleans, to the act of sale from Bouquie to Krohn; there was on it Willis Arnold's certificate, that he recorded it June 14, 1831, and Pierre Carco's affidavit of the 13th June, 1831.   Henry Kophnan proves that he left it with Lewis, the notary-public, when he made the sale as attorney of Bouquie.

Possession was held under it from 1815, the time of its date, and as an ancient paper it proves itself.   Carquette's constant admissions that he had sold the land, his surrender of the possession to Bouquie & Martin, and never again claiming, is further corroborative evidence, and seems to me to be as full proof as the nature of the case admits of after so great a lapse of time.   The verbal evidence of Carquette's sale to Bouquie & Martin is so full, by the witnesses of defendants as well as by those introduced by complainants, that there is no doubt of the fact of the sale, the identity of the land sold, or the price and

payment of the purchase-money, and, if the writing is not proved, still the decree should have been for a perpetual injunction, because

1st. The case is not within the statute of frauds. Such a sale as this was not contemplated by the legislature. The vendor had no title, legal or equitable. He was but an intruder on the public land, looking forward to a donation of the land from the government, in consequence of such settlement and improvement, and it was this possession, and the expectation founded on it, that was sold. The statute extends not to such cases, but to those only where the vendor has a present right or title, in law or equity. *Reed* v. *Mc Grew,* 5 Ham. 275. "A mere right of preëmption is not a title. It is only a proffer to a certain class of persons that they may become purchasers if they will." *Grand Gulf R. R. & Banking Co.* v. *Bryant,* 8 S. & M. 268. Then certainly a mere possession of public land, the person possessing not having even a right of preëmption, is not a title, and consequently not within the statute. *Clark* v. *Gellerson,* 2 App. (Maine) 18; *Woodberry* v. *Parshley,* 7 N. Hamp. 237; *Clark* v. *Shultz,* 4 Missouri, 235.

2d. The answer admits the sale, and does not plead the statute. It must be plead. Story, Eq. Pl. 598; Cooper, Eq. Pl. 256; *Tarlton* v. *Vietes,* 1 Gilm. R. 470; 2 Scam. 218; 4 Ib. 146; 2 Paige, 177; 1 Ark. R. 391.

3d. Even if there was no sale, the constant declarations of Carquette that he had sold to Bouquie & Martin, his abandoning the possession to them himself, during his life, and his heirs after his death asserting no claim, but standing by and permitting Bouquie & Martin to sell the land, and the purchasers to expend their money on it, and make large and valuable improvements, without asserting title, is a fraud upon the subpurchasers, and operated as an equitable estoppel. *Dickson et al.* v. *Green,* 24 Miss. R. 2 Cushm. 613; *Wendell* v. *Van Rensselaer,* 1 Johns. Ch. R. 353, and authorities cited by Kent; *Lee* v. *Porter,* 5 Johns. Ch. R. 272.

The sale by Martin to Bouquie of his interest is fully proved; and although no note or memorandum in writing is shown, and the contract, if within the statute, might be void between them,

Martin could not set up the statute as against the alienees of Bouquie. This is fully settled by *Dickson et al.* v. *Green,* before referred to, and if Martin could do so, the alienor of Bouquie & Martin cannot.

The conveyance from Bouquie to Krohn, although not a deed operative to pass a title, under our laws, is a sufficient *note or memorandum* under the statute. The power of Hofman is ample, and the writing of the name in the body by the notary in his presence, and the notary's signature, or either of them, would be sufficient. It is not necessary that the memorandum be subscribed; and calling on and causing the notary to draw up the act of sale, according to what they supposed to be the legal mode, was an authority to the notary to sign. *Johnson* v. *Somers,* 1 Humph. 268; *Ewing* v. *Ters,* 1 Bin. 450; *Blood* v. *Hardy,* 3 Shep. 61. He was lawfully authorized, and did subscribe, if subscription is necessary. *Pennyman* v. *Hartshorn,* 13 Mass. 87. After so long a possession the court will presume a conveyance. Matthews on Presumptive Evidence, 203, and authorities cited; 8 S. & M. 255.

Mr. Justice HANDY delivered the opinion of the court.

This was a bill in chancery filed by John Nixon against the appellees, heirs of John B. Carco, deceased, to quiet his title to a parcel of land, and to enjoin the execution of a judgment at law for the possession thereof, which the appellees had obtained against him.

The original and amended bills state, that in the year 1815, John B. Carco owned, or claimed, title to a tract of land embracing that in controversy, at the bay of Biloxi in this State, under the provisions of the act of congress of 3d March, 1803, and other acts, which land was afterwards confirmed to him by act of congress of 3d March, 1819; that he sold and conveyed a part of the land by instrument of writing, dated 7th October, 1815, in the following words: —

"Pass Christian, October 7th, 1815. I, the undersigned, declare that I, John Baptiste Carco, have sold to Messrs. Francis Bouquie and Anthony Martin, my plantation and two cabins situate thereon, with the enclosure and all the rails, the plantation and all the clearing from the mark B. to mark B.,

which were marked in the presence of Joseph Ladner, and extending in depth to the bay, said plantation is situated at the bay of Biloxi, for the sum of seventy dollars, which I declare to have received in cash before witnesses.

JEAN BAPTISTE CARCO."

That two stakes, marked B. and B. were set up, showing the east and west boundary of the land sold; that Bouquie & Martin took possession of the land at the time of the sale, and so continued until July, 1831, when Bouquie sold four and three quarter arpents thereof.to one Krohn for a full price paid; that Bouquie & Martin had been partners, and in the settlement of their affairs, Martin had relinquished his interest in the land to Bouquie; that Krohn immediately took possession, and exercised acts of ownership, sold parcels of the land, and put valuable improvements upon it to a large amount; and on the 6th December, 1837, he sold and conveyed a part of the land to John Nixon for $12,000 paid, who took possession, and has kept peaceable possession of it; that Carco lived in the neighborhood of the land until 1821 or 1822, when he died, and never made any claim to the land, and that the defendants and his heirs have, since his death, resided there until the year 1843, without setting up any claim whatever to it, and have even recognized Nixon as the owner by a conveyance of other land adjoining that in controversy, and referring to this land as his property, and well knowing that he was making valuable improvements upon the land; that one of the heirs has purchased a part of the land from Krohn, embraced in his purchase from Bouquie, and thereby recognized the validity of Krohn's purchase; that still the appellees have brought suit at law, and recovered judgment against Nixon for the land at March term, 1846.  He claims protection as a *bonâ fide* purchaser, and prays that the defendants may be decreed trustees of the legal title for him, and compelled to convey the same to him, and for a perpetual injunction of the judgment at law.

The defendants demurred to the bill, which was overruled. They afterwards answered, in substance, as follows:—

" That their father settled on the land, part of which is in complainant's possession, during the existence of the Spanish gov-

·ernment; that he held the land by possession only, and not by grant or purchase; and afterwards, in 1815, made a verbal sale ·of the improvements to Bouquie & Martin; that he did not own the lands at that time, and it was after that sale that he was registered as a settler, and it was not granted to him by the United States until 3d March, 1819; they charge the deed to Bouquie & Martin to be spurious, and not the act of their ancestor; they admit that Bouquie & Martin paid about seventy dollars for the improvements and clearing, but deny that that was a fair price for the settlement and improvement; they admit that Bouquie & Martin took possession, but deny that they held it until 1831, and state that they abandoned it before Carco's ·death; they deny the boundaries of the land claimed by com-.plainant or the existence of the marks B. and B., and deny that Krohn was a *bonâ fide* purchaser, and allege that he only pur-·chased the interest of Bouquie; they admit improvements made ·by Krohn to the value of about $5,000, and his quiet possession until 1837; they deny that their ancestor made no claim to the ·property after the sale, and admit that they resided in the vicin-ity from the time of their father's death, without asserting any title to the land; they admit that they executed a deed referring ·to the land in controversy, as the property of John Nixon, in April, 1843; also, that one of the heirs purchased a part of the land from Krohn, but state that it was done through ignorance ·of their rights and false assertions of Krohn; they admit that Nixon took possession at the time stated in the bill, but know ·nothing of his purchase; they deny that the alleged conveyance ·by Carco to Bouquie & Martin is an executory contract or con-:tains any covenant binding on them as heirs, or that it estops ·them from claiming their rights as heirs of Carco, and that if it ·is valid as a deed, it conveyed a legal title which was available ·at law.

Upon the final hearing upon bill, answer, and proofs, the bill ·was dismissed, and the complainant took this appeal.

The scope and object of the bill is to enjoin the heirs of ·Carco from setting up the title at law which accrued to them ·by operation of the patent issued to their ancestor in the year 1844, and to have that legal title declared to be held in trust for

the benefit of Nixon, under the circumstances of the case, which it is alleged show that it would be unconscientious for the heirs of Carco to hold the legal title against the equitable claim of the complainant.

We will, first, consider the objections to the relief sought, raised upon demurrer to the bill, and relied upon in the answer, as showing that the complainant is entitled to no relief in equity.

The first position taken in behalf of the appellees is, that the instrument of writing from Carco to Bouquie & Martin, in relation to the land, was the result of a mistake of law against which no relief can be granted in equity. It is admitted, for the purposes of this objection, that the instrument was intended and believed by the parties to be a valid and sufficient conveyance; and that this was a mistaken opinion as to its legal effect. The rule in such case is well settled to be, that equity will give effect to the real intentions of the parties, as gathered from the objects of the instrument and the circumstances of the case, although the instrument may be drawn up in a very inartificial and untechnical manner, if the manifest intent and object of the parties be clearly discernible on the face of the instrument. 1 Story, Eq. Juris. § 168. And accordingly the cases are numerous where this principle has been applied to the execution of deeds and powers. Ib. § 169, *et seq.*

Secondly. It is insisted that Carco had no title to the land at the time he executed the instrument, and, therefore, that nothing passed by it.

The bill and answers show that Carco settled upon the land during the existence of the Spanish government, and held possession of it when the supposed conveyance was executed, and that he thereby had an inchoate right of donation thereof from the United States under the provisions of the act of congress of 3d March, 1803. This right was reported to congress in 1816, by commissioners appointed, and was confirmed to Carco by act of congress of 3d March, 1819.

This right, at the date of the conveyance, was not a mere naked possession. It was an inchoate right to the land, recognized by the government, and for the completion of which the party entitled to it might well rely on the good faith of the

36 *

government.   There was nothing in the act of congress which
secured the right to prohibit the transfer of it, and there is
nothing in the objects or policy of the acts which would pre-
vent it.   It was, therefore, a substantial equitable right which
the party holding it might transfer; and when the title was con-
firmed in his name it enured equitably to the benefit of his
vendee.   This has been distinctly held by the supreme court of
Louisiana, and we think correctly, upon acts of congress simi-
lar to, if not the same as, the acts under which the right in this
case accrued.   *O'Brien* v. *Smith*, 16 La. R. 94; *Rhodes* v.
*Rhodes*, 10 Ib. 85.   And the principle on which it is founded
has been sanctioned by other courts.   *Jenkins* v. *Noel*, 3 Stew.
(Ala.) 77; *Alexander* v. *Duke of Wellington*, 6 Eng. Ch. R.
383; *Massie* v. *Sebastian*, 4 Bibb, 483.

The cases to the contrary cited in behalf of the appellee are
decided upon the preëmption acts of congress, which expressly
prohibit the transfer of the settler's right; and the acts of con-
gress (1804, § 14, and 1807, § 1 and 2,) relied upon as prohibit-
ing the settling or exercising acts of ownership over the public
lands, refer to persons exercising such acts of possession or
ownership after the passage of those acts, and not to cases of
settlement and inchoate right which had taken place before the
passage of those acts, and been recognized as legal, as is the
case in this instance.

But it is said that the instrument of sale executed by Carco
is not binding on his heirs, because it is not executory and con-
tains no covenant of warranty.

If the instrument purported to be, or was in fact, a mere quit-
claim of an interest in the land not then *in esse*, the authorities
cited from 14 J. R. 193, and 1 Cow. 616, would be pertinent to
show that the heirs were not estopped by the act.   But it is
admitted to have been intended as a valid and sufficient sale;
and we have above seen that the right intended to be sold was
a subsisting equitable one, and that the sale was not void for
illegality.   It purports to have been made for a valuable con-
sideration, and to be a conveyance of his right; and it is mani-
fest that the present claim of his heirs is utterly inconsistent
with the right intended to be conveyed by him.   If it were a

formal bargain and sale, there can be no pretence but that it would estop the heirs; and it is conceded that it was intended as such. It must, therefore, be considered as having that effect in equity, and to fall within the general rule, that the heir cannot set up a subsequently acquired title against the deed of bargain and sale of his ancestor. *Aldridge* v. *Kincaid*, 2 Litt. 391.

It is further objected that the bill relies upon the instrument as a legal assignment of Carco's right, and if such be its character, that under the provisions of the act of congress of 20th May, 1836, the legal title passed to the complainant as the assignee, and therefore he has no right to come into equity to have his title protected.

But the complainant cannot be considered the legal assignee of Carco, because, 1. The instrument is insufficient to pass the legal right, for want of the necessary legal formalities, and, 2. It was not made to the complainant, but to others whose transfers are informal and only sufficient, upon principles of equity, to pass the right.

We will now proceed to consider the merits of the case, upon the points presented in the answers to the original and amended bills and the testimony.

The first question that arises is, as to the authenticity of the instrument alleged to have been signed by Carco. Henry Ahrens, a witness, states that he had the paper in his possession in 1831; he got it from Bouquie, and sent it to New Orleans to Hopman, who was agent for Bouquie in making the sale to Krohn. Hopman states that he left it with the notary, Lewis, in New Orleans, in 1831, when the sale from Bouquie to Krohn was made. Lewis, the notary's son, saw it in 1831, when the sale was made. It was deposited in the notary's office, but was afterwards taken out by legal process.

Several witnesses state positively, that some time in the year 1815, Carco told them that he had sold the land to Bouquie & Martin, and had received the money for it. And the most of the witnesses state, that Carco never claimed the land after the sale. On the other hand, Jerome Ryan, whose name appears as a subscribing witness to the deed, states that he

does not remember being called to witness the deed; and if he had been, he would not have forgotten it. It appears, also, that Carco proved his claim under the act of congress in 1816; and some other witnesses express doubts as to the authenticity of the paper.

But from all the testimony we think the paper is sufficiently established. The positive testimony, showing its genuineness, cannot be outweighed by the less positive and uncertain negative testimony. It has been suggested that it was forged by Bouquie. But this is improbable; for if he had intended to make a forgery, he would have drawn the deed in his own name, instead of the names of Bouquie & Martin, and would have observed formalities more than appears to have been done in this paper.

The next point is, How much of the land of Carco was intended to be sold to Bouquie & Martin, and was the land in controversy here embraced in the sale?

Upon this point, there is much conflict among the witnesses. On the part of the appellees, it appears by the testimony of the surveyor, founded on the testimony of witnesses before him when he made the survey, that the land in dispute here was not embraced in the sale to Bouquie & Martin. The depositions of some other witnesses tend to prove the same result. But the great preponderance of the testimony goes strongly to show that it was embraced in the sale. Z. A. Caillavet proves the boundary lines and the stakes marked B., and minutely describes them, and that Bouquie & Martin took possession and had a house built on the land so bounded. Madame Fayard proves that her husband built a house for Bouquie on the place where Nixon's hotel stands. Mr. Moran proves the posts, and that the sale included the land claimed by Nixon. Narcise Richard, and B. Hally prove the same thing. Several witnesses prove that Carco stated that he had sold the land, and they describe it so as to include the land in controversy. We think, from all the testimony, that the conclusion cannot be avoided, that the sale to Bouquie & Martin included the land in controversy. Indeed, the answers do not deny this; but they admit that Carco made a verbal sale of his possessory right to the

property, though they deny the execution of the written instrument. Under the pleadings and proofs, we think that the inclusion of the land in the sale by Carco is sufficiently established.

The next point to be considered is, the question of possession after the sale by Carco.

And first, it fully appears that Carco neither had possession, or claimed any interest in the land after the sale, though he lived about six or seven years afterwards in the neighborhood and died there. Nor did his heirs, who have also lived in the neighborhood since his death, ever claim any interest in the property until about the year 1843, more than twenty years after the death of their ancestor.

Again. It is proved beyond dispute, that Bouquie & Martin had possession of the land purchased by them for five or six years after the purchase, and until Carco died; and that Krohn had possession from 1831 till 1837, since which time Nixon and his heirs have been in possession. There is some conflict between the witnesses, as to whether Bouquie & Martin retained possession of the property after they left that section of country to reside elsewhere. But we think that both the greater number of witnesses and the weight of testimony establishes, that they did retain possession and control of the property after their removal from the place, and until the sale to Krohn, by means of agents. This is proved by Z. A. Caillavet, N. Richard, Westbrook, Holly, Madame Fayard, and Deloney, the most of whom give the name of the person who had charge of the property for Bouquie, or Bouquie & Martin. The negative testimony on this point, is not so full and particular as that in behalf of the appellants, and we do not think it sufficient to destroy the direct testimony showing the continuance of possession or control by Bouquie & Martin after their removal.

It is not denied that the heirs of Carco were fully aware of the claim of Bouquie & Martin, and especially of that of Krohn, and still that they not only set up no claim to the property, but that they permitted him to make valuable improvements, and that one of the heirs actually purchased a part of the property from him.

But, it is said, that Krohn and Nixon must both be regarded as purchasers with notice, because they had before them the defective deed of Carco to Bouquie & Martin, through whom they derived title, and they must have had notice of the defect in the deed from Bouquie to Krohn, when the deed from Carco, which was produced, showed that the right or title, if any, was in Bouquie & Martin. Upon the last point, it may be observed, that the testimony shows that Martin had informally relinquished all his interest in the land to Bouquie, upon a settlement of their partnership affairs, about the time they removed from this State; so that although Bouquie had not power to convey a complete legal title, both for this reason, and because the paper executed by Carco did not convey a legal title, yet that he had an equitable interest which he had a right to transfer.

These objections would have great force at law upon a question of technical legal title, and doubtless had their due weight in the trial of the action of ejectment, the result of which is sought to be relieved against in this proceeding. But they cannot prevail against the rights of the parties in a court of equity.

When Nixon was about to purchase the property, what were the circumstances connected with it? He saw that it had been in the peaceable possession of those under whom he was to derive title for upwards of twenty years, by virtue of an instrument of writing executed by Carco, which, though not a formal deed of conveyance, was yet evidence that he had sold the land, and was a sufficient writing to conclude him from setting up title against it. Carco had been dead nearly twenty years, and his heirs had set up no claim whatever to the property, though living near it, and aware that Krohn had purchased it and expended a large sum of money in improving it; and some of the heirs had actually acquiesced in his title. Under such circumstances, was Nixon not justified in purchasing the property, and will the heirs of Carco be permitted to deprive him of the property by force of technical imperfections in his title? It cannot be a matter of doubt what the rule of equity is in such a case. It is clearly laid down by Chancellor Kent in *Wendell* v. *Van Rensselaer*, 1 Johns. Ch. R. 353, to be, " that if

one man knowingly, though he does it passively, by looking on, suffers another to purchase and expend money on land, under an erroneous opinion of title, without making known his claim, he shall not afterwards be permitted to exercise his legal right against such person. It would be an act of fraud and injustice, and his conscience is bound by the equitable estoppel." And this doctrine has been sanctioned by this court in 24 Miss. R. 618, and by universal adoption. And it is applied with more stringency when the acquiescence has been so long as to be fortified by the legal presumptions arising from great lapse of time. In *Grand Gulf Railroad, &c.*, v. *Ryan*, 8 S. & M. 279, this court says: "The authorities abundantly prove that, in favor of long possession, almost every variety of written evidence of title will be presumed. The defective links in the chain of title will be supplied by presumption, and the title declared perfect, when the possession has continued for a great length of time without interruption." S. P. in *Stephenson's Heirs* v. *McCreary*, 12 Ib. 47 et seq., and authorities there cited.

The plea of ignorance of their rights cannot be permitted to avail the heirs, under the circumstances of this case, to defeat the equitable rights of Nixon. For the evidence tends to show, that some of them had knowledge of the alleged defects in the conveyance from Carco, and still that no steps were taken to assert their right until the property had passed into the hands of Nixon, who had purchased it for a valuable consideration. Their failure to prosecute their claim, or in any manner to assert it, must, therefore, be considered as a recognition of the equitable right of those from whom Nixon derived title, and as precluding them from setting up their legal title against the equitable right acquired by him under the circumstances of this case.

Under a full view of the merits of the case in equity, we are satisfied that the complainant was entitled to the relief sought.

The decree is, therefore, reversed, and a decree directed perpetually enjoining the execution of the judgment at law, and that the appellees release to the appellants the legal title to the land in controversy, and that the appellees pay the costs.