SAMUEL MITCHELL et al. *v.* SAMUEL L. WOODSON et al.

1. TIME: COMPUTATION OF: NOTICE.—In the computation of the time for which notice is required to be given of the performance of an act, either the day on which the notice is given or the day of the performance must be excluded, and the other included. See *Hall* v. *Cassidy,* 25 Miss. R. 48.

2. SAME: SAME: STATUTORY MONTH IS CALENDAR, NOT LUNAR.—The modern rule is, that where a statute directs a month's notice to be given in reference to judicial proceedings, that it means a calendar and not a lunar month. See 10

Mitchell et al. *v.* Woodson et al.

Wend. 393; 1 Bailey (S. C.), 611; 4 Mass. 460; 2 Cow. 518; 2 Const. R. (S. C.) 604; 4 Bibb. 105; 5 Gratt. 285.

3. SAME: SAME: NOTICE TO NON-RESIDENT DEFENDANTS IN CHANCERY.—The statute (Hutch. Dig. 823, art. 17) requires publication of notice to non-resident defendants in chancery to be made "once a week for one month." This means that the publication shall be made for a calendar month, which period must intervene between the date of the first publication and the date of the last, excluding one and including the other of these dates.

4. CHANCERY: ACT OF 1856 DOES NOT APPLY TO THE OLD CHANCERY COURTS.— The Act of the 11th of March, 1856, in relation to Chancery Court (Rev. Code, 539–559), does not apply to proceedings subsequent to its passage in the Superior Court of Chancery and the District Chancery Courts; such proceedings are regulated by the provisions of the old code.

5. SAME: STATUTE OF LIMITATIONS: HOW PLEADED.—The Statute of Limitations of 1844 (see Hutch. Dig.) does not apply in terms to suits in chancery, but its spirit and substance will be applied by courts of equity to analogous cases pending therein; and hence, it is not necessary that the statute should be technically pleaded to a bill in chancery; it will be sufficient if the substantial matter which constitutes the bar be set out. See *Mandeville* v. *Lane*, 28 Miss. R. 317; *Gobb* v. *Robins*, 33 Id. 153.

6. PRINCIPAL AND SURETY: TRUSTS: STATUTE OF LIMITATIONS: CASE IN JUDGMENT. —Where land is conveyed by an absolute deed to a surety for his indemnity, and an obligation taken from him to convey to a third party (not one of the principal debtors), when he shall be released from liability as surety, there is no such relation of trust and confidence between the parties as will prevent the running of the Statute of Limitations in bar of a bill to compel the surety to convey, or deprive the surety of the power to acquire an individual interest in the premises, in derogation of the rights of the person in whose favor he executed the obligation to convey.

7. SAME: SAME.—Where a surety, to whom an absolute deed had been made for his indemnity, contracts to convey the premises to a third party (not the principal debtor), when he should be requested to do so after being released from his liability as surety, the Statute of Limitations would probably not run in his favor against a bill seeking a specific performance of the contract, until after the request to convey had been made and refused; but in such a case, if he acquire an outstanding adverse title apparently good, the statute would commence running from that date.

8. VENDOR AND VENDEE: QUITCLAIM DEED: RIGHT OF VENDOR TO ACQUIRE OUTSTANDING TITLE.—A covenant to convey with warranty of title deprives the covenantor of the right to acquire an interest in the premises in derogation of the rights of the covenantee. But the rule is otherwise where the covenant is to convey by quitclaim deed the interest which covenantor has at the time of the making of the covenant. See *Bush* v. *Cooper*, 26 Miss. R. 599; *Jackson* v. *Wright*, 14 J. R. 193; *Bank of Utica* v. *Mersereau*, 3 Barb. Ch. R. 568; *Jackson* v. *Hubbard*, 1 Cowen R. 613; *Jackson* v. *Winslow*, 9 Id. 18; *Nixon* v. *Carco*, 28 Miss. R. 414–426; 11 Wend. 119.

APPEAL from the Chancery Court of Hinds county. Hon. John Watts, chancellor.

On the 15th day of March, A. D. 1854, the appellees, being the heirs of R. L. Woodson, filed their bill in the Superior Court of Chancery against the heirs of Hugh Mitchell, and against S. Tift, their agent and tenant, and Samuel Lemly, who was in possession as their tenant of a part of the premises in controversy. The object of the bill was to procure a conveyance of the title of certain town lots in the city of Jackson to complainants, and to recover possession of them, and to collect from Tift the rents due by him as tenant and as agent, and to collect from Lemly the arrearages of rent due by him.

It appears from the record that in 1838, Hugh Wilson became the surety of Stockton & Wagly on a promissory note payable to one Owens, and that Woodson, who was the agent of Stockton & Wagly, in order to indemnify Mitchell against loss on account of his suretyship, procured Grimball & Martin to convey the lots in controversy to Mitchell by an absolute deed. In this deed, Grimball & Martin covenanted "to warrant and defend the title to the lots against the right, title, or claim of themselves, or either of them, their heirs, and all and every person claiming by, through, or under them, or either of them, but in no other manner or degree whatsoever." This deed is dated 7th March, 1840.

On the same day, Mitchell executed an instrument reciting the making of the deed to him by Grimball & Martin, and obligating himself to make to Robert L. Woodson such a deed to the lots as had been made to him by Grimball & Martin, "when the said Woodson shall release him from" the debt on which he was surety for Stockton & Wagly to Owens, "provided this release is made by Woodson in any reasonable time."

By agreement between Mitchell and Woodson, the lots were sold under an execution against Stockton & Wagly, and one Creel, and bid off by Mitchell at the sum of $200, which was never in fact paid by him. The sheriff's deed to him is dated 17th of May, 1841. On the succeeding day, Mitchell executed an instrument in which he recites his suretyship for Stockton & Wagly for $1500 to Owens, and that he had abandoned the lots in controversy, and

was in possession of the same, and binds himself, " when requested, after he shall have been released from his suretyship," to convey to Woodson " all the right, title, or interest he has, of, in, or to the premises, by quitclaim deed."

The complainants filed, as an exhibit to the bill, the note to Owens, on which Mitchell was surety, and on which there was an indorsement, dated 26th July, 1841, and signed by Owens, to the effect that he released his interest in the note to Woodson ; and the complainants aver that Woodson in his lifetime fully relieved Mitchell from liability on account of said note, and therefore was entitled to have the title conveyed to him, according to his contract with Mitchell.

The heirs of Mitchell were all non-residents ; and an order was entered deciding publication to be made against them once a week for one month. The proof showed that the publication had been made once a week for five successive weeks, the first insertion being on the 7th day of April, A. D. 1854, and the last on the 5th day of May, A. D. 1854.

On the 16th October, 1856, the complainants filed an amended bill, for the purpose of making other persons, who were heirs of Mitchell, defendants, and whose names had been omitted in the original bill. After the filing of the amendment, and on the 20th October, 1856, an order was entered directing publication to be made against these new parties once a week for one month, and fixing the day for their appearance on the first Monday of the ensuing December. This order was published weekly for five successive weeks, commencing on the 29th of October, 1856, and ending on the 26th of November following.

On this notice, *pro confessos* were taken against some of the defendants named in the original and amended bills, and the other defendants answered.

The answer denied that Grimball & Martin, the grantors to Mitchell, had any title to the lot in controversy, and set up an independent title in Mitchell, under a purchase made by him from one Grant, on the 22d day of October, A. D. 1845, who claimed under H. G. Runnells, to whom one Franklin Love made a deed on the 30th January, 1840, and it was alleged, though not proven, that Love had the true title at the time of his conveyance to Runnells.

The answer relied on the adverse possession of Mitchell under the sheriff's deed made in May, 1841, and also under the deed from Grant in October, 1845. The statement in the answer setting up the defence under the first deed, is as follows:

"The said Hugh Mitchell, after and in virtue of his said purchase, did, under his said purchase, take possession of said property, claiming it as his own, and by himself and tenants controlled, used, and possessed it as his own property from that time, and neither said Woodson in his lifetime, nor said Stockton nor Wagly never thereafter claimed, as far as respondents know or believe, any title or interest in said lot, but wholly abandoned the same. This possession of Mitchell, and of those claiming under him, these respondents plead and insist on in their defence."

The answer relied on the adverse possession of Mitchell and those claiming under him, after the purchase from Grant, in 1845, in language in substance the same.

It is alleged in the bill, that Woodson died in December, 1843, or January, 1844.

On the 22d October, 1857, the cause was transferred to the Chancery Court of Hinds county; and on final hearing the chancellor decreed in favor of the complainants, as prayed for in their bill. From this decree the defendants appealed.

*Yerger* and *Rucks*, for appellants.

1. The publication of notice to the non-resident defendants made on the filing of the original bill is insufficient. The statute requires that the publication shall be made for one month. This means a calendar and not a lunar month. 2 Mass. R. 170; 4 Ib. 460; Const. R. (S. C.) 606; 1 Bailey, 611; 4 Dallas, 143; 5 Conn. 357; 7 J. J. Marsh. 202; 3 Ib. 638; 2 Verm. 138; 2 Cowen, 518; 4 Kent's Com. (8th edit.), 98, and note. This publication commenced on the 7th April, and ended on the 5th May, and hence is insufficient.

2. The publication made on the filing of the amended bill is also insufficient. This publication was made after the Act of 11th of March, 1856, regulating chancery practice, went into operation. This act requires that two months shall intervene between the date of the order of publication and the time fixed for the appearance of the defendant.

3. The claim of appellees is barred by the Statute of Limitations. This is not a direct trust, but a mere contract to convey to a party not originally owning the land, upon certain conditions. *Prewett* v. *Buckingham*, 28 Miss. R. 92 ; Angell Lim. §§ 471, 472. Admitting that Mitchell's possession could not have become adverse under the deeds made in 1840 and 1841; nevertheless, his purchase from Grant, in 1845, was color of title, and a direct assertion of title adverse to Stockton, and Wagly, and Mitchell; and as he was only bound to reconvey by quitclaim, he could bring in an outstanding title. 14 J. R. 193; 7 Conn. 250; 9 Cowen, 1; 11 Wend. 110 ; 3 Barb. Ch. R. 528.

*D. Shelton*, for appellees,

Insisted that the statute was not sufficiently pleaded ; that the answer contained no notification to complainants upon which of the several statutes of limitation the defendants would rely.   He further contended, that as a court of equity was not absolutely bound by the Statute of Limitations, but adopted it only in analogy to courts of law, that it could adopt the statute in force when the contract was made, viz., twenty years, instead of the Act of 1844, passed afterwards, and which limited possessory actions to seven years.   That the Statute of Limitations at law merely barred the remedy, and did not affect the title ; but in equity it had the effect of destroying title, because, in this latter court, there was no distinction in the forms of remedies ; and if one bill was barred, all were barred ; and since this was the effect of the statute in equity, it was more consistent with the constitutional rule prohibiting the passage of laws impairing the obligation of contracts, and with justice, for the court to adopt the statute in force when the contract was made.

Moreover, the statute did not run in favor of Mitchell.   There was an express trust existing between the parties.   See 30 Miss. R. 218.   And again, by the second instrument, executed by Mitchell in 1841, he binds himself to make the conveyance " when requested;" and no request was ever made until the filing of the bill.

As to the objection, that the notices were not published " once a week for one month," it is replied, that they were published for five successive weeks, which is longer than a month.   The statute

could not mean that one month should intervene between the date of the paper in which the first insertion was made, and the date of that in which the last insertion was made; for these dates refer to the printing of the paper, and not to its publication. The publication takes place after the printing, and is really a continuous act, from the date of one paper to the date of the succeeding one. To hold otherwise, it would require a publication to be made for six successive weeks, in order to bring it within the rule of a publication " once a week for one month;" which would seem to be absurd, as there can never be but four weeks and three days in a month.

HANDY, J., delivered the opinion of the court.

This case is brought up by writ of error to the Chancery Court of Hinds county.

It appears that a decree *pro confesso* was taken, upon publication, against certain of the defendants in the court below; and the first question presented is, whether the notice of publication was sufficient.

The statute requires that the notice " shall be published weekly for one month." Hutch. Code, 823. The first publication of the notice was on the 7th April, 1854, and the last on the 5th May following, which, including both of these dates, makes but twenty-eight days. According to the rule of computation held by this court, one of these days should be included, and the other excluded. *Hall* v. *Cassidy*, 25 Miss. 48. And this would reduce the period of publication to less than a lunar month. But the general rule, as held in modern cases, and particularly in the United States, is, that when a statute requires a month's notice, and especially with reference to judicial proceedings, it must be taken to mean a calendar month, because it is the most beneficial to the party to be affected by it. 10 Wend. 393; 1 Bailey (S. C.), 611; 4 Mass. 460; 2 Cow. 518; 2 Const. Rep. (So. Car.) 604; 4 Bibb, 105; 5 Gratt. 285.

In cases of constructive notice to non-resident parties, there appears to be good reason for giving the statute authorizing it, such a construction as will allow them the greatest time to avail themselves of the notice. This is manifestly the most just construction, as well as the one sanctioned by modern authority. We

therefore think that the statute must be taken to mean calendar, and not lunar months; and it cannot be said that the publications here were made weekly for a calendar month.    Consequently, the decree *pro confesso* was irregular, and should be set aside.

Again, it is objected that the decree *pro confesso* upon the amended bill, was irregular, because the order fixing the day on which the non-resident defendants should appear, was made on the 20th October, 1856, fixing the first Monday of December following as the day of appearance, thereby allowing less than two. months for the appearance after the date of the order.    This was insufficient under the Statute of 1856, Rev. Code, 545, art. 34, which requires the time for appearance to be not less than two, nor more than six months; but it was sufficient, if it was governed by the pre-existing law in relation to the Superior Court of Chancery; and the question is, whether the Act of 1856 is applicable to suits pending in the Superior Court of Chancery, as this was at the time the order in question was made.    We think that it is not.    That act, in its terms, purports to be applicable to the chancery courts, under the system thereby established, and to regulate the practice and proceedings therein, after the jurisdiction of the Superior Court of Chancery should be superseded, or that court become extinct.    The mode of proceeding in that court in this matter is not expressly abrogated; and there is not such a necessary repugnance between the two modes of proceeding as to work a repeal of the pre-existing rule in relation to the Superior Court of Chancery by construction; for the latter statute does not in terms apply to the Superior Court of Chancery.    On the contrary, the language of the article referred to, appears to have special reference to the chancery courts of the counties; for it speaks of the order being made by the "judge;" which is inapplicable to the chancellor.

This objection is, therefore, not tenable.

But the notice and publication upon the amended bill is liable to the same objection as that upon the original bill, as that publication commenced on the 29th October, 1856, and ended on the 26th November following, so that the decree *pro confesso* on that bill was also irregular, and should be set aside.

The next question is, whether the defence of the Statute of Limitations is a bar to the bill.

It appears by the allegations of the bill, that Hugh Mitchell, being surety on a promissory note made by Stockton & Wagly, and in order to indemnify him therefor, the lot in controversy was conveyed to him by deed of quitclaim, dated 7th March, 1840, with the right to Woodson, who was in partnership in the mercantile business with Stockton & Wagly and another, to redeem the property from Mitchell, by paying the debt; and, on the same day, that Mitchell bound himself in writing to convey the premises to Woodson by deed of quitclaim, when Woodson should release him from the promissory note on which he was surety, provided Woodson should do so in a reasonable time; that afterwards the lot was, by the procurement of Woodson, Wagly & Stockton, sold under a judgment against them, and bid off by Mitchell, who paid no money thereupon, but it was conveyed to him by the sheriff by deed, dated 17th May, 1841, and on the 18th May, 1841, he bound himself by another instrument of writing to convey to Woodson his right and interest in the premises by quitclaim deed, when he should be requested, and after he should be discharged from all liability as surety on the note. The bill shows that Woodson died in December, 1843, or January, 1844, and it is filed by his heirs, and alleges that he paid the note in his lifetime, and discharged Mitchell from liability upon it. The representatives of Mitchell and those claiming under him are made defendants.

The answer, among other things, denies that either Woodson or his partners had any title to the lot, either legal or equitable, and alleges that Mitchell and those holding under him have had possession claiming title since the execution of the deeds mentioned in the bill, and this possession and claim are pleaded in bar; it admits that the first deed was procured by the instrumentality of Woodson to be executed to Mitchell, and to indemnify him for the note; it alleged that the title to the lot was in one Love, who conveyed it by deed, which is exhibited, dated 30th January, 1840, to one Runnells, as whose property it was sold and conveyed by the sheriff's deed, which is exhibited, dated 11th December, 1844, to one Grant, who conveyed it by deed exhibited, dated 22d October, 1845, to Mitchell for a valuable consideration, under which Mitchell and those claiming under him have held possession from the date of that purchase, and this is pleaded as a bar to the bill.

Several objections are urged in behalf of the defendants in error against the defence of the Statute of Limitations.

First. It is objected, that the statute is not sufficiently pleaded, because the answer setting up the defence does not specially rely *on the statute* as a bar, and because it does not state what particular statute is relied on. The first section of the Act of 1844, Hutch. Code, 829, provides, that all possessory and other actions for lands shall be commenced within seven years next after the right or title thereto, or cause of action, shall accrue. This statute has been held not to be, in terms, applicable to suits in chancery, but that courts of equity would adopt the spirit and substance of the limitation in analogous cases in that court, and apply the principle of the statute, and the limitation thereby created, to such cases. *Mandeville* v. *Lane,* 28 Miss. 317 ; *Goff* v. *Robins,* 33 Miss. 153. Hence, it is not necessary to set up the statute in a formal and technical manner in a suit in chancery. * It is sufficient if the substantial matter, which the statute makes a bar to the claim, be set forth and relied on as a defence.

Here the answer in substance alleges that Mitchell and his tenants have been in possession of the premises, claiming title, since the execution of the two deeds mentioned in the bill, the latter of which is dated 17th of May, 1841. From that time the answer claims title by adverse possession, a period of about thirteen years before the filing of the bill. This was sufficiently certain to apprise the complainants of the ground of defence, which was that of adverse possession for a period prescribed by law for barring the claim.

The defence of adverse possession, under the deed to Mitchell of 22d of October, 1845, is set up in the answer in the same manner, and for the same reason is sufficient.

Secondly. It is objected, that the defence of adverse possession is not available to Mitchell, his tenants, and agents, under the circumstances apparent from the pleadings and proofs in the case ; and several grounds are taken in support of this position.

1st. It is said that Mitchell stood in the relation of trustee to Woodson, which precludes him from relying on the Statute of Limitations, as a bar to the performance of his obligation to convey the premises, upon being discharged from his liability as surety on the

note, and also from acquiring an interest in the premises in opposition to the rights of his *cestui que trust.*

We do not think that Mitchell stood in the position of a trustee in the matter, in a just legal sense, either as a direct trustee, or one by implication. He took the deeds, it is true, to indemnify himself against his liability on the note. But his obligation to convey the premises to Woodson consisted entirely in the *positive contracts in writing* which he made, binding himself to do so. If, apart from his written obligations, there was any trust raised by the fact of his taking the deeds for the purpose of indemnity, to be executed by conveyance after he should be discharged from the note, it was for the benefit of Stockton and Wagly, or of Woodson, Creel, Stockton, and Wagly, at whose instance and for whose use the deeds were executed to Mitchell. But instead of this, an express obligation was taken from Mitchell, binding him to convey the premises *to Woodson,* his heirs and assigns. The whole obligation to convey, therefore, consists in the *contract* made between the parties, and which this bill, in effect, seeks to have specifically performed. Such being the attitude of the parties, the rule preventing a trustee from acquiring and setting up an individual interest in the subject-matter of the trust, in derogation of the rights of his *cestui que trust,* does not apply.

2d. It is insisted, that Mitchell was bound by his contract of 18th of May, 1841, to convey to Woodson, *whenever requested,* and that this prevented the running of the statute until request made, which was not done until this bill was filed.

There is force in this position; and if the case stood alone upon the defence of the Statute of Limitations set up to the contract of May, 1846, or upon the adverse possession held under the deeds of March, 1840, and May, 1841, it would appear to be a good answer to the defence. But in addition to these grounds of defence, the answer set up an adverse possession under a deed executed to Mitchell, by one Grant, on the 22d of October, 1845, conveying a title apparently paramount to that conveyed by the deeds to Mitchell, of March, 1840, and May, 1841, being deraigned from a deed from Franklin Love to Runnells, dated 30th of January, 1840. This deed to Mitchell would be at least sufficient color of title upon which to found the defence of adverse possession; and this is set

up as a distinct ground of defence to the bill, showing an adverse possession under an independent title for more than eight years before the filing of the bill. And this was a good defence to the bill, unless Mitchell was incapable, by reason of the contracts he had made to convey the premises to Woodson, of acquiring a title in opposition to the interest which he had bound himself to convey.

It is well settled that if a party covenant to convey *with warranty* of title, he is incapable of acquiring an interest in the premises in derogation of the rights of his covenantee, and that any title subsequently acquired by him will inure to the use of the covenantee; because he is estopped by his covenants, which run with the land, from setting up any claim against the title thereby assured. *Bush* v. *Cooper*, 26 Miss. 599; *Jackson* v. *Wright*, 14 John Rep. 193; *Bank of Utica* v. *Mersereau*, 3 Barb. Chan. Rep. 568; *Jackson* v. *Hubbell*, 1 Cowen, 613.

But in this case, Mitchell had covenanted to convey *by quitclaim* deed such title as he had acquired and then held under the deeds to him of March, 1840, and May, 1841. It being a contract merely to do a specific thing, he was not bound beyond its terms; and as he was not bound by any covenant of warranty to defend or perfect the title of Woodson, he had the right to acquire for himself an independent title; for that would not disable him to perform his contract to Woodson, which was to *release* to him *the title which he had previously acquired.* This doctrine is well sustained by authority of the cases last cited, and *Jackson* v. *Winslow*, 9 Cowen, 18; *Nixon* v. *Carco*, 28 Miss. 414–426; 11 Wend. 119.

We are of opinion, therefore, that the defence of adverse possession and claim under the deed from Grant was a bar to the bill, and that under it the bill should have been dismissed. And as this defence is applicable to the defendants who have answered, as well as those against whom decrees *pro confesso* were taken, there is no good reason for remanding the cause for further proceedings as to the latter defendants.

The decree is therefore reversed, and the bill dismissed.

Note 1. A week is a definite period of time, commencing on Sunday and ending on Saturday: and where a statute requires notice to be published weekly for a specified time, it is not necessary that the publication should be made on every seventh day; it is sufficient if a publication be made in each week computed as above from Sunday to Saturday. *Rokendorff* v. *Taylor's Lessee*, 4 Peters R. 349.

NOTE 2. The foregoing rule in relation to the right of the vendor in a quitclaim deed to purchase in a paramount title, in opposition to his vendee, is changed by the Rev. Code, 309, Art. 17.